## Rodgers v. Bellam

C.P. of Chester County, no. 95-05873.

*Richard D. Lucente,* for plaintiff.
*J. Michael Kvetan,* for defendant.

OTT, *J.,* September 22, 1998—This trial was a result of an appeal from arbitration at which the board of arbitrators awarded plaintiff $27,500. The jury awarded the plaintiff zero damages and he now files post-trial motions requesting a new trial. Plaintiff contends that the verdict was against the weight of the evidence.

It was stipulated that the defendant, James H. Bellam Jr., caused an automobile accident when his car struck the plaintiff's car in the rear. The trial was for damages only.

## SUMMARY OF THE FACTS

On July 29, 1994, the plaintiff, Michael Rodgers, was on vacation when he was rear-ended while stopped at a red light. He went to Burdette-Tomlin Hospital in Cape May Courthouse, New Jersey, on July 31, and his cervical spine was x-rayed. The x-ray showed no evidence of fracture, subluxation or dislocation. He was sent home with a cervical collar and told to take Motrin. On August 2, 1994, he presented to Dr. Mahaveer P. Prabhakar, complaining that the pain was not relieved, and x-rays were taken of his lumbar spine. A letter report from this doctor was entered into evidence and the doctor reported that, as a result of his examination, he diagnosed significant cervical and lumbar sprain and strain. He prescribed narcotics and muscle relaxants, and advised plaintiff to see an orthopedist when he returned home.

On August 8, 1994, plaintiff reported to Robert Linn Medical Associates for treatment. He reported that he was still in constant pain. He was seen by Dr. Silverman

of the Linn group, who reported that his examination revealed severe tenderness and spasm of the cervical paraspinal muscles, the trapezius muscles, and the lumbar muscles, with a severe restriction of motion. The diagnosis was:

(1) Acute post-traumatic cervical strain and sprain.
(2) Left cervical radiculopathy.
(3) Acute post-traumatic lumbar strain and sprain.
(4) Left lumbar radiculopathy.
(5) Acute post-traumatic trapezius myofascitis.
(6) Acute post-traumatic dorsal strain and sprain.

On August 19, 1994, the plaintiff was seen by Stephen E. Sacks D.O., a neurologist who basically confirmed Dr. Silverman's diagnosis. EMGs were ordered and the results were offered into evidence. The results of these tests were abnormal, correlating with a C5-6 cervical radiculopathy involving the left arm. An MRI was done and that test showed a mild cervical spondylosis but no herniation.

When Dr. Silverman saw the patient on September 6, 1994, he was still complaining of pain and a weak left-hand grip. The plaintiff was referred to an orthopedic surgeon for evaluation.

On September 8, 1994, the plaintiff was seen by Dr. Michael C. Saltzburg, an orthopedic surgeon, and Dr. Silverman's diagnosis was once again confirmed. Plaintiff was ordered to continue with physical therapy as had been ordered when initially seen in August. When Dr. Silverman last saw the plaintiff on February 15, 1995, after monthly follow-up care, the prognosis was guarded. Dr. Silverman reported that the radiculopathy remained, and the bulging or herniated lumbar disc with persistently tight muscles might be permanent.

In evidence at the trial were: emergency room records from Burdette-Tomlin Memorial Hospital for services on July 31, 1994; reports from Mahaveer P. Prabhakar M.D.; reports from Robert Linn Medical Associates;

reports from Delaware Valley Rehabilitation Center Inc., which performed the physical therapy; reports from Dr. Stephen E. Sacks D.O. (neurologist); and reports from Dr. Saltzburg (orthopedic surgeon).

Dr. Silverman testified by deposition, basing his testimony on his own treatment of the patient as well as the reports reviewed from the other doctors as we discussed above. After discussing the various tests that plaintiff had undergone and elaborating on the reports which he had reviewed, Dr. Silverman, the treating physician and expert, testified that his final diagnosis was "a chronic cervical strain and sprain; a chronic trapezius myofascitis; a chronic lumbar strain and sprain; a left C5-6 radiculopathy; a bulging disc at L5-S1; he has a sciatica condition, which may be musculoskeletal or neurologic." He was then asked,

"Q. Now, doctor, do you have an opinion to a reasonable degree of medical certainty as to whether the automobile accident of July 29, 1994 was a competent producing cause of the injuries for which you and the other physicians have treated Michael Rodgers?

"A. Yes. Going from the emergency room visit on July 31, 1994, through the care at our offices, through the care rendered by other physicians, such as specialists we sent him to, and the doctors who saw him afterwards, all of his symptoms were consistent and derived definitely from the accident of July 29, 1994.

"Q. Do you have an opinion to a reasonable degree of medical certainty as to whether the diagnosed injuries are a competent producing cause of pain?

"A. In my opinion, they are.

"Q. Do you have an opinion to a reasonable degree of medical certainty as to whether the diagnosed injuries are a competent producing cause of disability?

"A. They do not disable him from work. They certainly, by history, at least, disable him from certain activities, such as mentioned above, such as yard work and athletics and so forth.

"Q. Now, there was an—was that opinion rendered to a reasonable degree of medical certainty?

"A. It is.

"Q. Now, you mentioned earlier, though, that there was a period of time following this accident when he was unable to perform his job?

"A. Yes. And it was derived from the fact that he stated he was disabled, at the time he first saw us, from the accident. And I recorded later that—looking through my notes, that he had returned in mid-September of 1994. So he had been out from July 29 to mid-September. About six weeks, I would judge.

"Q. So, doctor, do you have an opinion to a reasonable degree of medical certainty as to whether these diagnosed injuries, at least initially, were a competent producing cause of disability?

"A. Yes, they were.

"Q. And that would be—and your response would be?

"A. They were the cause.

"Q. Of that—

"A. Of the disability, yes.

"Q. That you've described from July 29 through mid-September 1994?

"A. That's correct.

"Q. Do you have an opinion to a reasonable degree of medical certainty as to the likelihood that Michael Rodgers will continue to experience symptoms of neck pain with radiation into his left arm and lower back pain with radiation into his left leg caused by these physical injuries?

"A. I do have an opinion.

"Q. And that is?

"A. That is, he will continue. After four years, there is little likelihood that these symptoms will go away.

"Q. Do you have an opinion to a reasonable degree of medical certainty as to whether the injuries affected Michael Rodgers' work and life activities in the past?

"A. Well, they certainly have. I mean just consider, if you will, that a person is in an accident and then winds up seeing doctors off and on for the next four years. That certainly has a lot of effect on people's lives, just in terms of trying to make appointments to doctors and rehab centers and so forth and tests, all of which is—

"Plus, whatever you can't do in terms of your normal daily life during that time. It's very disruptive.

"Q. And, of course, you have noted the activities which he has indicated have been affected as a result of this accident and his injuries?

"A. Yes. I think I've mentioned a couple of times, with is sports and his housework and so forth, or even playing with his son, have been limited.

"Q. Is that opinion to a reasonable degree of medical certainty?

"A. Is what opinion?

"Q. Is you opinion that—these activities that you've described earlier on, which you didn't necessarily allude to here, is it your medical opinion to a reasonable degree of medical certainty that these injuries have, in the past, affected his activities in work?

"A. It's by history only, there's no way of evaluating that further. By history, yes.

"Q. Okay. And you've seen no records or you've not been shown anything which would indicate to the contrary?

"A. Yes, that's true.

"Q. You found Mr. Rodgers to be a very credible person throughout the time that you saw him?

"A. I have had no reason to doubt his credibility on any occasions.

"Q. And the records that you've seen all along from the time he was seen initially at the hospital until your most recent visit in 1998 were consistent, in terms of

his complaints, the clinical findings and what's happened with him?

"A. They were, entirely.

"Q. Now, doctor, do you have an opinion to a reasonable degree of medical certainty as to the likelihood that these injuries will continue to affect Mr. Rodgers' work and social activities in the future?

"A. Yes. As I mentioned before, I see no reason to believe that his symptoms will change a lot.

"Q. Have all the opinions you've rendered here today in this direct examination been to a reasonable degree of medical certainty?

"A. Yes." (Deposition testimony 4/9/98, pp. 57-62.)

At argument on this motion for a new trial, the defense attorney argued that the evidence that would support the jury verdict was his cross-examination of the doctor. On cross, counsel ascertained that the doctor's fee for testifying was $1,600, that he had charged the plaintiff approximately $1,525 in medical bills, that Dr. Silverman was not the plaintiff's "family doctor" (however, it was clear that he was his treating and referring physician), and that although the plaintiff was disabled from work for about six weeks following the accident, at the time of discharge in 1995, he was doing a limited workout at a health club. (Deposition testimony 4/9/98, pp. 63-78; trial exhibits P-19 & P-19(a).) He also illustrated that there was evidence of degenerative change in the cervical spine of the plaintiff at C-5 and 6. This attempt at impeachment of the plaintiff's witness does not serve, without more, to outweigh the evidence presented in the form of other reports, as well as the bulk of the medical testimony and that of the plaintiff.

## DISCUSSION

This judge has the discretion to determine whether or not a new trial should be granted based on the jury having rendered a verdict that is obviously against the

weight of the evidence. *Brodhead v. Brentwood Ornamental Iron Company Inc.*, 435 Pa. 7, 255 A.2d 120 (1969). In the case sub judice, a case where liability was admitted, we have carefully reached the conclusion that we cannot let the verdict stand. There was no testimony presented by the defendant to counterbalance the medical evidence from at least four doctors who reached the same core medical conclusions that the plaintiff was injured by the accident and that the injuries were painful and impaired physical function. In order to reach a zero verdict, the jury would have had to disbelieve all of the testimony of the plaintiff[1] and his treating physician as well as four other doctors. A verdict must bear some reasonable relation to the loss suffered by the plaintiff as demonstrated by the evidence at trial; and although, as charged, a jury may ignore or disbelieve some or all of the testimony of any witness, the verdict must not be so disproportionate to the uncontested evidence as to defy common sense and logic. *Neison v. Hines,* 539 Pa. 516, 653 A.2d 634 (1995). We believe that, here, the jury's verdict was disproportionate to the uncontested evidence and the zero verdict was unjust. See *Fillmore v. Hill,* 445 Pa. Super. 324, 665 A.2d 514 (1995). We do not exercise that discretion lightly, holding in highest regard the integrity of the jury system in our way of justice, but are constrained to order the following:

## ORDER

And now, September 22, 1998, upon consideration of the plaintiff's post-trial motion, a new trial is hereby granted.

---

1. The plaintiff chose not to have a transcript of the plaintiff's testimony, but rather to rely on the doctor's exhibits and deposition. It can be assumed that the substance of the plaintiff's testimony was favorable to himself.